[Cite as *State v. Benson*, 2019-Ohio-3234.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2018-A-0054** |
| LYNDEE A. BENSON, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Ashtabula County Court of Common Pleas, Case No. 2018-CR-0094.

Judgment: Reversed and remanded.

*Nicholas A. Iarocci*, Ashtabula County Prosecutor, and *Shelley M. Pratt*, Assistant Prosecutor, Ashtabula County Courthouse, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Marie Lane*, Ashtabula County Public Defender, Inc., 4817 State Road, Suite 202, Ashtabula, OH 44004 (For Defendant-Appellant).

MARY JANE TRAPP, J.

{¶1} Appellant, Lyndee A. Benson, appeals her conviction for aggravated possession of drugs following her no contest plea. Ms. Benson argues the Ashtabula County Court of Common Pleas erred in denying her motion to suppress. We reverse and remand, having determined from the totality of the circumstances that once Ms. Benson admitted to having drugs in her purse and was removed from the vehicle, she was, as any reasonable person would believe, in custody. Thus, her statements following

her initial admission to the police should have been suppressed. The trial court made no factual findings as to the physical evidence from the search of Ms. Benson's purse that occurred at the same time she was removed from the vehicle. Thus, the trial court has failed to provide us with a sufficient basis upon which to determine whether its decision to not suppress the physical evidence was supported by competent, credible evidence. We remand on this limited basis for the trial court to make findings of fact and conclusions of law based on the evidence adduced at the suppression hearing as to whether the drugs seized were the result of an unlawful search.

## Substantive and Procedural History

{¶2} Ms. Benson's conviction stems from a traffic stop of a targeted vehicle in which she was a passenger. Upon the officer's questioning, she admitted methamphetamine was in her purse. A search of her purse discovered the drugs.

{¶3} Ms. Benson was indicted and charged with aggravated trafficking in drugs, a felony of the fourth degree, and aggravated possession of drugs, a felony of the fifth degree. She subsequently filed a motion to suppress, arguing her statements and the substances found were inadmissible because she was subjected to a custodial interrogation without any *Miranda* warnings.

### *The Suppression Hearing*

{¶4} Ashtabula County Sheriff's Deputy Scott Daniels ("Officer Daniels") was the sole witness at the hearing. He testified that he was on a special assignment as a "chase car." This meant he was assigned to a targeted drug residence and instructed to follow any vehicle leaving the residence until the vehicle either committed a traffic violation or led to other investigative sources.

2

{¶5} An individual Officer Daniels was familiar with, Ryan Dougherty, was driving the vehicle. Mr. Dougherty had been observed dropping off a female on West 38th Street and circling the block while the female went into a residence. Officer Daniels was instructed to follow the truck once the female returned to the vehicle.

{¶6} Once the truck left the area with the female inside, Officer Daniels followed the vehicle for approximately one mile before observing Mr. Dougherty fail to signal while changing lanes. Officer Daniels initiated a traffic stop, and several other cruisers appeared on the scene, pulling up behind Mr. Dougherty's vehicle. These cruisers, at least one unmarked and two with K-9 officers, were involved in the chase car operation and on standby in the area. Two of these officers, Sergeant Trader, an interdiction drug officer with the Ohio State Highway Patrol, and Officer Hildebrand, an interdiction drug officer with the Ashtabula City Police, were the first to approach the vehicle. The K-9 officers, while available, were never deployed.

{¶7} Officer Daniels then had a conversation with Ms. Benson, asking her "* * * where she was coming from. If she knew the driver. I asked her if there was anything illegal I should know about inside the vehicle or on her person." She responded that "There wasn't." He told her he had observed her moving around the vehicle before the stop and that it was at that point, Officer Daniels testified, she "started breathing hard" and became visibly nervous, failing to make eye contact.

### The Body Cam Video

{¶8} The video from the body cam, worn by Officer Daniels and submitted into evidence, was played during the hearing. The video is 14 minutes and 34 seconds in length and begins without audio for approximately one minute. Ms. Benson is seen sitting

3

in the front passenger seat. She gives her license to Officer Daniels. Only Officer Daniel's hands, which are holding her license, are visible. Ms. Benson's face is obscured by the officer until he reaches toward the body cam and turns on the audio, shifting his position.

{¶9} After audio recording begins, Officer Daniels can be heard telling Ms. Benson, "I can already see how nervous you are getting. You got something on you." At that point, Ms. Benson states, "I do." The officers can be heard asking Ms. Benson "where's it at," and telling her to "tell the truth," and "be honest." It is not long before Ms. Benson admits to having something in her purse. She is told to step out of the vehicle and leave the purse on the seat.

{¶10} At this point, Ms. Benson is standing outside the vehicle. Sergeant Trader opens the driver's side of the vehicle and retrieves her purse. The other two officers are surrounding Ms. Benson, and multiple police cruisers are behind the vehicle. She admits to having "speed" in her purse, no needles, and "nothing else." An officer asks her where she got it and then tells her, "this is where your honesty is really going to help me out."

{¶11} Ms. Benson tells the officers she "got it from a friend to give to a friend" and was doing a favor for a "friend." The officers inquire as to her driver, Mr. Dougherty, who she disclaimed knowing, stating he was simply "a ride" and had "no idea what she was doing." The officers keep questioning who the friend was and how she knew where to go, urging her "to be honest," and stating, "this is the time to be honest, think about what we are asking you." Ms. Benson does not reply, appears visibly nervous and chokes back tears.

{¶12} An officer then asks her how often she goes over "there" to do friends a "favor." Eventually, the officer's questioning elicits an admission that the drugs belonged

4

to the daughter of Ms. Benson's aunt [Ms. Benson's cousin], who told her to drop the drugs off to an individual who would meet her in a nearby park. The unknown individual would approach her, and no money would be exchanged.

{¶13} The officers interject statements with their questioning, such as: "you can tell us who it was from," "we won't go run and tell them, that's not what this is about," and "the best thing you can do is be honest, we already know a lot of what we are going to find." When asked about her personal drug use, she admits she smokes or did smoke marijuana.

{¶14} Sargent Trader interrupts the questioning and again asks Ms. Benson how she knows Mr. Dougherty. She repeats that Mr. Dougherty is simply giving her a ride. Sergeant Trader informs Officer Daniels that one of them (Ms. Benson or Mr. Dougherty) is lying since their stories are not the same. He continues to ask her how she knows Mr. Dougherty and through which mutual acquaintances. Officer Daniels interjects with the name, "Donny," and the officers continue to interrogate her as to whether Mr. Dougherty is friends with Donny, and "Donny who."

{¶15} Ms. Benson raises her hands to her face and says, "I can't even…I can't have both of you…." Officer Daniels says, "Okay, we will just let him talk to you," pointing to Sergeant Trader. After several more questions, Sergeant Trader walks away, saying within earshot of Ms. Benson, "does she want to go to jail?" Officer Daniels asks her again, "who did she get this methamphetamine from?"

{¶16} After several more questions as to whom she was meeting, Officer Hildeband asks her if "she would be willing to go back there to buy more 'ice' for the police?" Ms. Benson replies this is her aunt's house, so she does not know. He then

asks her how much methamphetamine was at the house. She says, she "doesn't know," and that "she [her aunt] had what was left and put it on a scale and handed it to her" and said, "when I got kicked out of my ex's house, she let me stay in Ohio Village and she just said I owed her a favor." Officer Daniels then asks, "What do you guys want to do with her?"

{¶17} The officers discuss taking her to the station and charging her with possession. They then again question Ms. Benson about whom she was meeting and where. Dispatch can be heard over the questioning, "For clarity, they came out of a different residence than our target residence, just so you guys know." Officer Daniels continues questioning her as to whom "she was meeting; what she was supposed to do, and how it was that guy even now knows who she was even meeting?" She describes what her aunt instructed her to do. Then an officer states, "And now you are getting charged with possession of drugs * * * and trafficking * * *."

{¶18} As two of the officers walk away, one asks Ms. Benson if she "knows where her aunt is getting "it" [the drugs] from. The officer then shows the drugs to a woman in the front seat of one of the cruisers, telling her it was "meth, crystal, it comes out of Mexico." The video ends with Ms. Benson with her head in her hands and the officers standing around the scene discussing what they should do next.

{¶19} Ms. Benson was never placed under arrest, was never handcuffed, and was never given *Miranda* warnings.

{¶20} The trial court denied Ms. Benson's motion to suppress all evidence finding that on review of the testimony and evidence presented, "it does not appear that this was a custodial interrogation necessitating *Miranda* warnings."

6

**{¶21}** Ms. Benson entered a written plea of no contest to aggravated possession of drugs, in violation of R.C. 2925.11(A)(C)(1)(a), a felony of the fifth degree. The aggravated trafficking in drugs count was dismissed. The court sentenced Ms. Benson to two years of community control, with conditions.

**{¶22}** Ms. Benson now timely appeals, raising the following assignment of error:

**{¶23}** "The trial court erred when overruling Appellant's motion to suppress."

## Motion to Suppress Standard of Review

**{¶24}** We give due deference to the trial court's assignment of weight and inferences drawn from the evidence when ruling on a motion to suppress on appeal. (Citations omitted.) *State v. Starcovic*, 11th Dist. Portage No. 2007-P-0081, 2008-Ohio-2758, ¶10, citing *State v. Wilson*, 11th Dist. Ashtabula No. 2007-A-0044, 2007-Ohio-6557, ¶11.

**{¶25}** Thus, appellate review of a motion to suppress presents a mixed question of law and fact. (Citations omitted.) *Id.* at ¶11, citing *Wilson* at ¶12. "The appellate court must accept the trial court's factual findings, provided they are supported by competent, credible evidence. * * * Thereafter, the appellate court must independently determine whether those factual findings meet the requisite legal standard. *Id.*, citing *Wilson* at ¶12, citing *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, ¶8. We review the trial court's application of the law de novo. *Id.,* citing *State v. Zaken*, 11th Dist. Ashtabula No. 2006-A-0036, 2007-Ohio-2306, ¶14.

### *Custodial Interrogations*

**{¶26}** Ms. Benson raises a single issue in her assignment of error, contending that

7

the trial court erred in ruling she was not subjected to a custodial interrogation that required *Miranda* warnings.

{¶27} "In *Miranda* [*v. Arizona*, 384 U.S. 436], at 444, * * * the United States Supreme Court established procedural safeguards for securing the privilege against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution. The Fourteenth Amendment to the United States Constitution makes the privilege against self-incrimination applicable to a witness in a state proceeding." *Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, ¶8, citing *Malloy v. Hogan*, 378 U.S. 1, 3 (1964). "A similar privilege is recognized in Article I, Section 10 of the Ohio Constitution." *Id.*

{¶28} "What are now commonly known as *Miranda* warnings are intended to protect a suspect from the coercive pressure present during a custodial interrogation." *Id.* at ¶9, citing *Miranda* at 469. "A custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Id.,* quoting *Miranda* at 444. "If a suspect provides responses while in custody without having first been informed of his or her *Miranda* rights, the responses may not be admitted at trial as evidence of guilt." *Id.,* quoting *Miranda* at 479.

{¶29} "Any statement, question or remark which is 'reasonably likely to elicit an incriminating response' is an interrogation." *State v. Knuckles*, 65 Ohio St.3d 494, 495 (1992), citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The questions asked of Ms. Benson were designed to elicit inculpatory responses.

{¶30} Ms. Benson was a suspect from the outset. Officer Daniels was instructed to follow Mr. Dougherty's truck once the female he dropped off at a target drug house

returned to the vehicle. Officer Daniels had suspicions based on facts and circumstances that occurred prior to the stop and which laid a legitimate foundation for the initial, basic questions posed to Ms. Benson while she was in the passenger seat of the vehicle. The same cannot be said of the questions posed after she was removed from the vehicle.

**{¶31}** While "[p]olice officers are not responsible for unforeseeable incriminating responses," the initial questions were designed and reasonably likely to elicit incriminating statements. Ms. Benson was a target since she was seen in the vicinity of a known drug house and was followed by the officers until they had probable cause to stop the vehicle for a traffic law violation. *State v. Strozier,* 172 Ohio App.3d 780, 2007-Ohio-4575, ¶20 (2d Dist).

**{¶32}** After Ms. Benson made her initial incriminating statements, she was removed from the vehicle and her pursed immediately searched. At this point from the video, it appears the only legitimate basis for this search was incident to arrest. And it is at this point we determine the interrogation became a custodial interrogation.

### *When does questioning after a traffic stop become a custodial interrogation?*

**{¶33}** A roadside motorist detained for questioning pursuant to a routine traffic stop does not usually constitute a custodial interrogation requiring a driver [or passenger] to be read his or her *Miranda* warnings. *State v. Ferrell*, 11th Dist. Portage No. 2017-P-0018, 2017-Ohio-9341, ¶28, citing *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).

**{¶34}** The Supreme Court of Ohio recently reviewed the development of the law in the area of traffic stops and *Miranda* warnings in the *Oles* case, *supra*. Writing for the majority, Chief Justice O'Connor began the analysis with two critical observations underpinning the reasonable person in the suspect's position test from the Supreme Court

9

of the United States' decision in *Berkemer,* which were then applied in *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255.

{¶35} The first observation was that "although a traffic stop 'significantly curtails the "freedom of action" of the driver and passengers, if any, of the detained vehicle,' the stop alone does not render a suspect "in custody" and therefore does not trigger the need for *Miranda* warnings.' * * * '[I]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him "in custody" for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda.*'" *Oles* at ¶11, quoting *Berkemer* at 440.

{¶36} Secondly, it is the "noncoercive aspects of a traffic stop that 'mitigate the danger that a person questioned will be induced 'to speak where he would not otherwise do so freely.'" *Id.* at ¶12, quoting *Berkemer* at 437. Using examples from *Berkemer*, the court contrasted a station house interrogation to a traffic stop, noting the latter is generally temporary with only a short period of questioning, which may result in a citation before the driver is free to go, and generally a traffic stop is less "'police dominated' than interrogations that require *Miranda* warnings because the law-enforcement officer's 'aura of authority' over the driver is offset by the public nature of the stop and the typical one-to-one ratio of officer to motorist." *Id.* at ¶12, citing *Berkemer* at 437-439.

{¶37} Thus, the *Berkemer* court held that "the only relevant inquiry is how a reasonable person in the suspect's position would have understood his or her situation." *Id.* at ¶13, citing *Berkemer* at 442.

{¶38} There is no bright-line rule to employ in determining whether *Miranda* warnings are required. Instead, a fact-specific inquiry must be applied to the facts in each

case to assess whether an individual during a traffic stop is "in custody" such that *Miranda* warnings are required. *Id.* at ¶21-23.

{¶39} The Second District has consistently considered ten factors "* * * to assess how a reasonable person in the defendant's situation would understand his situation:

{¶40} "1. What was the location where the questioning took place—i.e., was the defendant comfortable and in a place a person would normally feel free to leave? For example, the defendant might be at home as opposed to being in the more restrictive environment of a police station;

{¶41} "2. Was the defendant a suspect at the time the interview began (bearing in mind that *Miranda* warnings are not required simply because the investigation has focused);

{¶42} "3. Was the defendant's freedom to leave restricted in any way;

{¶43} "4. Was the defendant handcuffed or told he was under arrest;

{¶44} "5. Were threats made during the interrogation;

{¶45} "6. Was the defendant physically intimidated during the interrogation;

{¶46} "7. Did the police verbally dominate the interrogation;

{¶47} "8. What was the defendant's purpose for being at the place where questioning took place? For example, defendant might be at a hospital for treatment instead of being brought to the location for questioning;

{¶48} "9. Were neutral parties present at any point during the questioning;

{¶49} "10. Did police take any action to overpower, trick or coerce the defendant into making a statement." *State v. McCrary*, 2d Dist. Montgomery No. 18885, 2022 WL

11

125760 (Feb.1, 2002), 2-3, citing *State v. Estepp*, 2d Dist. No. Montgomery App. 16279, 1997 WL 736501 (Nov. 26, 1997), 4.

### *The Trial Court's Findings*

{¶50}  In this case, the trial court found the following facts determinative of a non-custodial interrogation:

{¶51}  "Defendant exits the vehicle at the direction of the officers.  Five uniformed officers including Deputy Daniels are visible on the body camera footage.  The officers continue to talk and ask the Defendant questions for approximately twelve minutes.  However, in the first two minutes of speaking with the Defendant, she provided her identification and acknowledged she has an illegal substance.  At no time on the video was the Defendant advised of any *Miranda* rights warnings.  During this time, the Defendant is standing by the vehicle.  She is not handcuffed, placed in a police cruiser, or constrained in any way.  She was not patted down.  An officer tells her, 'this is your time to be honest with us.'  The Defendant voluntarily answers questions regarding the alleged drugs.  The Defendant was not arrested."

{¶52}  While the trial court correctly cited the *Berkemer* standard and considered cases addressing the Fifth Amendment right under the United States Constitution, it failed to consider the test set out in *Oles* and to consider the import of Article I, Section 10 of the Ohio Constitution that provides greater protections than the Fifth Amendment regarding the admissibility of physical evidence seized as the result of statements made without the benefit of *Miranda* warnings.  In fact, the trial court made no findings regarding the evidence seized.

### *Applying the Oles Test to the Facts of This Case*

{¶53} When we apply the law to the facts presented, we find no reasonable person, who upon questioning admits to possessing an illegal substance, is then asked to step from the vehicle blocked in the rear by three police cruisers and is surrounded by five officers, with three of those officers interrogating her regarding her possession of drugs and what she intended to do with the drugs, would believe herself *not* to be "in custody." Her purse is not within reach; she is not asked whether she will voluntarily consent to a search of her purse; a baggie is taken from inside her purse; and the interrogation continues without *Miranda* warnings.

{¶54} These facts present a situation that "exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that [she] be warned of [her] constitutional rights." *Ferrell* at ¶31, quoting *Ole* at ¶30-31.

{¶55} "It is not a detainee's freedom of movement that makes a traffic stop constitutionally unoffensive. It is, instead, the relative brevity, limited scope, and non-threatening character of the police intrusion." *Ferrell* at ¶28, quoting *State v. Wineberg*, 2d Dist. Clark No. 97-CA-58, 1998 WL 409021, 5 (Mar. 27, 1998), citing *Berkemer. See Ferrell* at ¶37 (where we reversed the trial court's denial of appellant's motion to suppress, holding that under the totality of the circumstances, the appellant was "in custody" at the time he admitted the substances in his sock were "dope and heroin" and that he had a "rig" in his backpack). *See also Farris* at ¶4 (where the Supreme Court of Ohio found the appellant's incriminating statements inadmissible because he was administered *Miranda* warnings after admitting he had marijuana in the trunk of his car but was not told that his previous admissions could not be used against him. The officer then asked the appellant

the same questions and obtained the same responses regarding the location of the drug paraphernalia).

{¶56} The questions from the outset of the stop were investigative as to Ms. Benson's crime of possession and possession for sale. Once Ms. Benson admitted to having "speed," and the police removed her from the vehicle, she was for all intents and purposes "in custody."

{¶57} She was then subjected to extended questioning by multiple officers as to the possession of and her intent to deliver the drugs. As previously noted, from the video it appears the only legitimate basis for this interrogation was incident to arrest. In fact, the officers discussed whether to further detain Ms. Benson, but until that determination was made, Ms. Benson was clearly not free to leave. *Miranda* advisements should have preceded any questioning after Ms. Benson was removed from the vehicle.

{¶58} Ms. Benson's case is quite like another drug interdiction case in the Second District, *State v. Jirac*, 2d Dist. Montgomery No. 15-CR-756, 2016-Ohio-8187, which affirmed the lower court's grant of a suppression motion after a thorough consideration of the ten factors. Law enforcement had intercepted nine kilos of a Schedule I drug in Lexington, Kentucky and then decided to allow the drugs to continue to its destination at the Centerville, Ohio UPS office in order to identify the recipient. *Id.* at ¶3.

{¶59} A team was assembled in and around the UPS store. *Id.* Mr. Jirac arrived, collected the package, and was intercepted before he was able to leave the store. *Id.* He was told why he was being detained and was taken out the back door for questioning designed to obtain information about the supply chain in a more private setting. *Id.* Without prior *Miranda* warnings and with comments from the interrogating officer that

14

cooperation would be helpful to Mr. Jirac's predicament, Mr. Jirac agreed to cooperate and gave details of the operation. *Id.* Mr. Jirac was *Mirand*-ized later at the station and once again made inculpatory statements. *Id.*

{¶60} The Second District affirmed the trial court's decision to suppress the evidence considering the totality of the circumstances and the objective test of whether a reasonable person, under similar circumstances, would have understood that he was in custody at the time of the interrogation. *Id.* at ¶12. Both the trial court and the reviewing court relied on evidence in the record to find that "by show of authority, Jirac was detained from leaving the UPS Store, was told that the package contained illegal substances, was directed to the back parking lot so that he could not flee, and was then questioned about the drugs in the presence of multiple officers." *Id.*

{¶61} In this case, as the body cam footage demonstrated, after Ms. Benson was removed from the vehicle, she was subjected to police questioning that could only elicit self-incriminating statements. There were no questions regarding the reason for the traffic stop. The questions were "designed to pressure a suspect to confess to illegal conduct." *Oles* at ¶28. The officers were clearly using open-ended questions about the drugs in Ms. Benson's possession, her supplier, and what she intended to do with the drugs. Indeed, this questioning elicited statements that formed the basis for not just an aggravated possession count but an aggravated trafficking in drugs count as well.

{¶62} Further, they were exerting coercive pressure by telling her "to be honest," and that they would "not run and tell the person" from whom she was getting the drugs. Not once did the officers advise her about her legal rights to silence and counsel.

{¶63} Ms. Benson was physically in between an open vehicle door and two or more officers, who surrounded her during the interrogation. The truck, in which she was a passenger, was blocked in by multiple patrol cars. There were no neutral persons present. The officers verbally dominated the interrogation. At one point she throws up her hands at the barrage of questions from two officers at the same time and states, "I can't even…I can't have both of you…." At which point, Officer Daniels instructs Sargent Trader to solely pose questions to Ms. Benson.

{¶64} By any objective measure, the questioning by the police in this case was "systematic, exhaustive, and managed with psychological skill." *Farris* at ¶29. "These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained *a choice about continuing to talk*." (Emphasis added.) (Citation omitted.) *Id.*

{¶65} This is not a case where the suspect admitted to possessing a substance and then was informed of her rights before questioning resumed with an advisement that the earlier statements could not be used against her (the voluntariness test). This is a case where law enforcement completely failed to inform Ms. Benson of her right against self-incrimination. Under these circumstances, Ms. Benson's statements made after she was removed from the vehicle should have been suppressed.

{¶66} The dissent takes issue with and misapprehends our consideration of the Second District's *Estepp* factors, arguing the factors are an "artificial test," which will "unnecessarily burden" an officer with considering as many as ten factors in order to determine if a *Miranda* warning is required.

**{¶67}** These factors are not an exhaustive and exclusive metric to be utilized in law enforcement training or by a reviewing court when evaluating whether *Miranda* warnings should be given at any point during questioning. These ten factors are characteristics to consider together with all other facts and circumstances surrounding the suspect's encounter with law enforcement when applying the *Oles* "suspect position" test—how a reasonable person in the suspect's position would have understood his or her situation.

### The Trial Court Failed to also Consider the Enhanced Protection Afforded by the Ohio Constitution.

**{¶68}** In *Farris, supra,* the Supreme Court of Ohio examined whether the protections against self-incrimination under the Fifth Amendment of the United States Constitution and Section 1, Article 10 of the Ohio Constitution prevent evidence to be excluded that was obtained as a direct result of statements made in custody without the benefit of *Miranda* warnings.

**{¶69}** The court reviewed the Supreme Court of the United States' holding in *United States v. Patane*, 542 U.S. 630 (2004), where the court rejected the argument that physical evidence seized as a result of unwarned statements is the practical equivalent of a statement, declining to extend the Fifth Amendment protection against self-incrimination to direct evidence. *Id*. at ¶42-44, citing *Patane* at 643-44. This did not, however, end the Supreme Courtof Ohio's analysis since "[t]he Ohio Constitution 'is a document of independent force[,] * * * [and] state courts are unrestricted in according greater civil liberties and protections to individuals and groups.'" *Id.* at ¶46, quoting *Arnold v. Cleveland*, 67 Ohio St.3d 35 (1993), paragraph one of the syllabus.

17

**{¶70}** The Supreme Court of Ohio held that "Section 10, Article I of the Ohio Constitution provides greater protection to criminal defendants than the Fifth Amendment to the United States Constitution." *Id.* at ¶48. "Only evidence obtained as the direct result of statements made in custody without the benefit of a *Miranda* warning should be excluded." *Id.* at ¶49. The court expounded that to "hold otherwise would encourage law-enforcement officers to withhold *Miranda* warnings and would thus weaken Section 10, Article I of the Ohio Constitution." *Id.*

**{¶71}** While we recognize the law in *Farris, supra*, we cannot say based on the trial court's determinations of fact if it applies to the case at hand**.** Ms. Benson was not arrested at the scene. She was issued a citation. As a result, the failure of the trial court to make any factual determinations and legal conclusions in its judgment entry regarding the evidence seized is problematic because the record is not clear as to the state's justification for searching the purse given that she was not taken into custody.

**{¶72}** Crim.R. 12(F) mandates that a trial court state its essential findings on the record when factual issues are involved in determining a motion to suppress. *State v. Brown*, 2d Dist. Montgomery No. 24297, 2012-Ohio-195, ¶10. We note that Ms. Benson did not specifically request findings of fact; however, the record, standing alone is insufficient to allow a review of the search of Ms. Benson's purse and the drugs seized. *Id.*

**{¶73}** Because the trial court failed to provide us with a sufficient basis upon which to determine whether its decision was supported by competent, credible evidence, we remand for the trial court to make findings of fact and conclusions of law based on the

18

evidence adduced at the suppression hearing as to whether the drugs seized were the result of an unlawful search.

**{¶74}** The procedural safeguards articulated over 50 years ago in *Miranda v. Arizona* have been sometimes criticized as interfering with law enforcement's ability to effectively investigate crimes, but despite challenges to *Miranda*, the core principles articulated in the decision have withstood the test of time and have not hamstrung crime fighting. Many forget that after his conviction was overturned, Mr. Miranda was retried— his confession was not introduced into evidence and he was convicted.

**{¶75}** The trial court's decision is reversed, and the case remanded for the trial court to make findings of fact and conclusions of law based on the evidence adduced at the suppression hearing as to the search of Ms. Benson's purse and the drugs seized.

TIMOTHY P. CANNON, J., concurs in judgment only with a Concurring Opinion,
MATT LYNCH, J., dissents with a Dissenting Opinion.

_____

TIMOTHY P. CANNON, J., concurring in judgment only.

**{¶76}** I respectfully concur in judgment only with regard to the lead opinion, as I do not believe we need to address, adopt, or apply the ten factors outlined by the Second District in *Estepp* and *McCrary*, *supra*. The Supreme Court of Ohio has held that the only relevant inquiry in determining whether a person is in custody is how a reasonable person in the suspect's position would have understood his or her situation *under the totality of the circumstances. See, e.g., State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, ¶14

19

and *Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, ¶1 (following *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). In this case, the circumstances are clear and straightforward.

{¶77} The dissenting opinion also merits a response. While there are many interesting comments in the dissent, I cannot agree with describing this as a "routine traffic stop." It was anything but. The officers observed Benson exiting from what they believed was a drug house. They were mistaken. The drug house was next door to the house from which Benson exited. The vehicle in which Benson was a passenger was then pulled over by officers from (1) the Ashtabula City Police, (2) the Ashtabula County Sheriff's Department, and (3) the Ohio State Patrol. They literally surrounded the vehicle. When the officers approached passenger Benson, there was no discussion regarding any reason for a traffic stop—they were immediately focused on drug possession. The cases cited by the dissent that permit an officer to question the driver regarding the basis for a traffic stop simply do not apply here.

{¶78} Based on the officers' mistake of fact and Benson's admissions, the nature of the encounter was one of an extended detention, not a routine traffic stop. *See Farris*, *supra*, at ¶12 ("Here, Farris's extended detention was not based upon the purpose of the original stop, excessive speed, but was based upon Menges's detection of the scent of burnt marijuana."). "Although a motorist who is temporarily detained as the subject of an ordinary traffic stop is not 'in custody' for the purposes of *Miranda* * * *, if that person 'thereafter is subjected to treatment that renders him "in custody" for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*.'" *Id.* at ¶13, quoting *Berkemer*, *supra*, at 440.

20

{¶79} Also, the dissenting opinion states that the lead opinion "takes issue only with the questioning by police that took place after Benson exited the vehicle. Presumably, had Benson not been asked to move a few feet to the right in order to leave the car, the majority would find no necessity to Mirandize her." This characterization misses the point of the holding in this case. While Benson was still in the car, she admitted to having drugs in her purse. Up to that point, the officers had no reason to detain her. After she admitted to having drugs in her purse, an officer told Benson to exit the vehicle and leave her purse. As she exited, Benson watched another officer retrieve her purse from the driver's side and begin to search for the drugs. At that time, she was surrounded by at least three police officers. No reasonable person, knowing she had just admitted to having drugs and that the drugs were now in possession of the police, would believe she was free to go.

{¶80} Our holding today follows very clear precedent from the Supreme Court of Ohio. It is not in any way, as the dissent suggests, an expansion or a loose interpretation of *Miranda*. Further, the case against Benson is not dismissed as a result of this opinion: it is remanded for the trial court to proceed, but without the (very limited) incriminating statements made in response to questions posed by officers after Benson had been detained for possessing drugs. The outcome of the proceedings thus far, i.e., Benson's plea to one count of drug possession, may not change on remand.

_____

MATT LYNCH, J., dissents with a Dissenting Opinion.

21

{¶81} I respectfully dissent from the majority's decision to reverse the trial court's denial of Benson's motion to suppress on the ground that statements elicited from Benson occurred during an interrogation while she had not been Mirandized. A review of the totality of the circumstances indicates that the police questioning of Benson occurred during a traffic stop at which time she was not in custody. Since the facts do not support a conclusion that a custodial interrogation took place, suppression is unwarranted.

{¶82} A fair and thorough review of whether *Miranda* warnings were necessary in the present matter cannot be completed without first considering the underlying rationale of the *Miranda* decision and whether it has been expanded in a manner that provides protections to defendants that were not anticipated and are more detrimental than beneficial to society as a whole. Considering both the majority's holding in *Miranda v. Arizona*, 384 U.S. 436, 545, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as well as the opinions of the dissenting justices provides necessary context, lest this court or others fail to appreciate the concerns that arise when interpreting *Miranda* rights too broadly and expanding rights beyond what were anticipated by the framers of the Fifth Amendment.

{¶83} In 1966, the majority in *Miranda* expressed concern with the current police tactics utilized in obtaining confessions, emphasizing that in each of the cases before the court on appeal, "the defendant was questioned by police officers, detectives, or a prosecuting attorney in a room in which he was cut off from the outside world," being "thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures." *Miranda* at 445, 457. The court sought to address the dangers inherent in this secret and private form of interrogation. It further examined police officers' use of physical and psychological coercion, emphasizing the utilization of questioning tactics

22

specifically designed to coerce suspects, such as asking questions designed to minimize moral blame, create insecurity, and trick the subject of the questioning. *Id.* at 450-455. These concerns greatly influenced the Supreme Court's now well-known holding that a person facing a custodial interrogation must be advised of his right to remain silent and right to the presence of an attorney and warned that his statements can be used against him.

**{¶84}** The *Miranda* court adopted this standard in light of concerns where police questioning was often a secretive practice conducted in the private confines of an interrogation room. However, this standard has been interpreted over the following decades to encompass questioning of suspects that is far less likely to be coercive. At the time *Miranda* was decided, several justices expressed alarm with its scope and breadth in interpreting and applying the Fifth Amendment, noting: "for all the Court's expounding on the menacing atmosphere of police interrogation procedures, it has failed to supply any foundation for the conclusions it draws or the measures it adopts." *Miranda* at 537 (White, J., dissenting).

**{¶85}** While there may be legitimate concerns about improper questioning by police in some scenarios, there is little proof that creating an expansive interpretation of the Fifth Amendment is the proper method to address such issues. Studies conducted after the *Miranda* decision have demonstrated negative consequences associated with providing *Miranda* warnings. One study, which collected and analyzed statistics from multiple cities, concluded that confession rates fell approximately 16 percent post-*Miranda*. Cassell and Fowles, *Still Handcuffing the Cops? A Rev. of Fifty Years of Empirical Evidence of Miranda's Harmful Effects on Law Enforcement*, 97 B.U.L.Rev.

23

685, 691-692, 695 (2017) (also noting that the National Research Council of the National Academy of Sciences has found that studies suggest *Miranda* warnings "may have resulted in a reduction of confessions of between 4 and 16 percent").

{¶86} Further, it was recognized *Miranda* constituted a significant deviation from the Supreme Court's prior holdings. As Justice Clark emphasized in a dissenting/concurring opinion in *Miranda*, custodial interrogation had long been accepted as an important tool of law enforcement and was evaluated under a general totality of the circumstances rule rather than requiring additional, burdensome requirements such as an affirmative waiver, the burden of proving waiver placed on the prosecution, the required presence of counsel during questioning, and the ability to withdraw waiver. Noting the history of case law to the contrary, Justice Clark concluded that "[t]o require all those things at one gulp should cause the Court to choke over more cases than" only the two it expressly overruled. *Miranda* at 502 (Clark, J., concurring in part and dissenting in part).

{¶87} The majority herein now takes another large swig from the chalice of unintended consequences by expanding the meaning of being in custody.

{¶88} Concerns raised regarding the expansion of *Miranda* have been borne out by the application of *Miranda* in this state, with questioning performed during roadside traffic stops interpreted as custodial interrogations even in instances where there has been no arrest. In *State v. Farris,* 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, a routine traffic stop was conducted for speeding. Upon the officer noticing the odor of marijuana, Farris was instructed to enter the police cruiser while a search of his vehicle was conducted. The court held that statements made while Farris was questioned inside

24

of the cruiser amounted to a custodial interrogation. *Id.* at ¶ 12-15. However, Farris was not handcuffed, not told he was under arrest, nor otherwise placed into formal custody. The Ohio Supreme Court has reaffirmed its application of *Miranda* in *Farris* in a subsequent decision as well, *Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, ¶ 23, confirming its expansion of the definition of custodial interrogation under *Miranda*.

{¶89} Any expansion of the definition of custodial interrogation under *Miranda* is especially troubling because of its overall impact on society. The defendant is not the only person impacted by the decisions made by the courts in this arena. As adeptly summarized in Justice White's *Miranda* dissent: "The Court's duty to assess the consequences of its action is not satisfied by the utterance of the truth that a value of our system of criminal justice is 'to respect the inviolability of the human personality' and to require government to produce the evidence against the accused by its own independent labors. * * * More than the human dignity of the accused is involved; the human personality of others in the society must also be preserved. Thus the values reflected by the privilege are not the sole desideratum; society's interest in the general security is of equal weight." *Miranda* at 537 (White, J., dissenting).

{¶90} Justice White expanded upon the "undesirable impact" of extending Fifth Amendment rights too far, using the example of the need to protect society from the danger of a murderer and the impact of releasing such an offender due to a failure to provide *Miranda* warnings has on society. *Id.* at 539.

{¶91} The interest in protecting society raised by Justice White is perhaps nowhere more applicable than in the present case involving drug trafficking and drug

25

dealing.  Removing a drug trafficker from the streets by an arrest and conviction provides a significant benefit to society while also protecting potential victims from the dangers arising from drug use, a danger which cannot be overstated.  Particularly noteworthy is the fact that a conviction also serves the interests of the offender, holding her accountable for the crime and providing the ability to return to society improved.  This is especially relevant in our current court system, where programs such as drug courts provide rehabilitative functions that serve a defendant far better than being returned to the streets.[1]

**{¶92}** Removal of options to treat those suffering from drug addiction is a legitimate concern in the application of *Miranda*.  Ohio Supreme Court Chief Justice Maureen O'Connor recently emphasized the necessity of utilizing the criminal justice system to treat drug offenders when discussing a proposed constitutional amendment to reclassify lower level drug offenses.  She observed that the proposed amendment would "take away the incentive from people who are suffering from substance abuse disorders to carry out the terms of probation, especially the term of treatment."  This would prevent judges from utilizing tools such as the imposition of a prison term for a parole or probation violation, which can successfully push the defendant toward drug rehabilitation.  Toledo, *Ohio Chief Justice Takes Hardline Stance Against Issue 1*, The Observer, http://observer.case.edu/ohio-chief-justice-takes-hardline-stance-against-issue-1/  (Nov. 2, 2018).  The Chief Justice recognized: "We also know that through long-term treatment

---

1.  According to the National Institute of Justice, drug court programs have been shown to decrease recidivism, with one county showing that the felony re-arrest rate decreased from 40 percent before the drug court program to 12 percent after the drug court was instituted.  National Institute of Justice, *Do Drug Courts Work? Findings from Drug Court Research*, https://www.nij.gov/topics/courts/drug-courts/pages/work.aspx (accessed August 1, 2019).

and therapy, those addicted can lead law-abiding, productive lives." O'Connor, *The Hidden Disaster of State Issue 1*, http://ohiopa.org/oconnor1.pdf (Aug. 28, 2018).

**{¶93}** The deterrent function of our justice system is eviscerated by loosely interpreting *Miranda* to allow an addicted defendant to evade punishment and miss the opportunity for treatment. Rather than failing to hold a defendant accountable while exercising an overabundance of caution in protecting against perceived improper behavior by officers, it would be wise to consider that accountability for offenders provides a better outcome for society and for the offender.

**{¶94}** Expanding *Miranda* may serve to return drug dealers and traffickers to the streets of their communities although there is reasonable evidence to demonstrate that they have committed a crime. Courts may claim to have upheld the rights of the defendant but this overzealous protection comes at the expense of the right of the public to feel safe and secure and may actually lead to the overdose of a defendant who might have otherwise escaped the death sentence of addiction. The expansion of the duty to use *Miranda* requirements may serve to provide even more protections to the accused but we must ask "at what cost?"

**{¶95}** With the foregoing in mind, it is necessary to consider whether *Miranda* warnings were required under the facts of the present case. It has been consistently held that routine traffic stops ordinarily do not give rise to concerns regarding custodial interrogations or require *Miranda* warnings. *Berkemer v. McCarty*, 468 U.S. 420, 436, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *State v. Steerman*, 11th Dist. Ashtabula No. 2007-A-0054, 2008-Ohio-1691, ¶ 44; *State v. Stone*, 11th Dist. Portage No. 2007-P-0048, 2008-Ohio-2615, ¶ 18. This is the case for a multitude of reasons, including that such

stops are brief and take place in public, allowing others to observe the interactions between the officer and motorist. "This reduces the ability of policemen to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that if he does not cooperate, he will be subjected to abuse." *Steerman* at ¶ 45. While there are some instances where a traffic stop can progress to a custodial interrogation, "[t]he relevant inquiry is whether, under the totality of the circumstances, a reasonable person in the suspect's position would have understood himself or herself to be in custody." *Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, at ¶ 1.

**{¶96}** It warrants emphasis that *Miranda* warnings are only necessary in the case where a defendant is in custody. A custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602, 16 L.Ed.2d 694. As to roadside detention of a motorist or passenger, the United States Supreme Court has explained that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." *Berkemer*, 468 U.S. at 440, 104 S.Ct. 3138, 82 L.Ed.2d 317. *Miranda* becomes applicable only when "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Id.* quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983).

**{¶97}** This court has previously addressed the same concerns that arise in the present case in *State v. Brocker*, 11th Dist. Portage No. 2014-P-0070, 2015-Ohio-3412, conducting a review of case law recognizing the limited applicability of *Miranda* to roadside traffic stops:

28

In *State v. Rice*, 1st Dist. Hamilton Nos. C-090071-C-090073, 2009-Ohio-6332, the First District reversed the trial court's suppression of the motorist's admissions made while he was in the back seat of the police cruiser before he was read his *Miranda* warnings during a traffic violation stop. It held that the defendant was not in custody for *Miranda* purposes. * * * The court emphasized that the driver was not handcuffed at the time and that the officer's questioning was neither lengthy nor intimidating. *Id.* at ¶ 10-15.

In *State v. Serafin*, 11th Dist. Portage No. 2011-P-0036, 2012-Ohio-1456, this court held that the motorist was not in custody for *Miranda* purposes during a routine traffic stop. * * * The officer explained that Serafin smelled of alcohol and that his eyes were glassy. * * * Serafin admitted to having a couple beers over dinner, and the officer then initiated the field sobriety tests. * * * Serafin was subsequently arrested and read his *Miranda* warnings at that time. On appeal, we upheld the denial of the motion to suppress * * *.

Other appellate courts have considered comparable facts and agreed that most traffic stops and accompanying investigatory questioning do not constitute custodial interrogations warranting the right to *Miranda* warnings. *State v. Engle*, 2d Dist. Montgomery No. 25226, 2013-Ohio-1818; State v. Barnett, 2d Dist. Montgomery No. 14019, 1994 Ohio App. LEXIS 4767 * * * (Aug. 31, 1994) (holding that roadside questioning of motorist while in the rear of the police cruiser for a short period of time does not constitute a custodial interrogation); *State v. Leonard*, 1st Dist. Hamilton No. C-060595, 2007-Ohio-3312, ¶ 22-23 (holding that the intrusion was minimal based on the short length of the detention and the fact that the officer did not take the defendant's keys or search his vehicle); *State v. Wineberg*, 2nd Dist. Clark No. 97-CA-58, 1998 Ohio App. LEXIS 1159 * * * (Mar. 27, 1998) (holding in part that the detention of a driver in the back seat of a cruiser during a traffic stop does not invoke *Miranda* protection).

*Id.* at ¶ 15-17.

{¶98} Based on the case law cited above, this court in *Brocker* determined that questioning during the traffic stop did not rise to the level of a custodial interrogation since the detention was brief (less than six minutes) and incriminating statements were made during the course of the traffic stop. *Id.* at ¶ 18. *Brocker* is instructive in the present matter where the statements were made by Benson during the course of a routine traffic stop, not while she was handcuffed, arrested, or subjected to a lengthy detention or

29

removed from the roadside where the vehicle had been stopped.

{¶99} It is noteworthy that this court takes issue only with the questioning by police that took place after Benson exited the vehicle. Presumably, had Benson not been asked to move a few feet to the right in order to leave the car, the majority would find no necessity to Mirandize her. This creates a slippery slope and may lead to the requirement that officers give *Miranda* warnings whenever they simply approach a citizen for a traffic stop. This would burden police by requiring a reading of *Miranda* rights where the risk of coercive questioning is minimal at best.

{¶100} An evaluation of the entirety of the facts and circumstances of this matter warrants a conclusion that Benson was not in custody. She was in a vehicle stopped by police for a valid reason and volunteered information about having an illegal substance in her purse. While she was then asked to exit the car and was further questioned by officers about her possession of drugs, she was never handcuffed, told she was under arrest, placed in a police cruiser, or touched by any of the police officers. She and the officers were parked in an area near both businesses and homes and all discussions occurred while they were clearly visible to the public. The aspects that prohibit police abuse, as discussed above, were present. *Steerman*, 2008-Ohio-1691, at ¶ 45. While this writer recognizes that several officers were present during this stop, this fact alone does not render the interrogation custodial, especially when taking into consideration that Benson spoke primarily with only one or two officers while the others were occupied with tasks such as searching the vehicle. Thus, under the reasonable person standard, there is no custodial interrogation. As discussed earlier, this court has held there was a lack of custodial interrogation in potentially more restrictive conditions, where the defendant was

30

detained in the police cruiser during questioning. *Brocker*, 2015-Ohio-3412, at ¶ 18.

{¶101} The majority, while recognizing that there is no bright-line rule for determining when *Miranda* warnings are required, nonetheless proceeds to set forth a ten-factor test for such a decision, outlined by the Second District in *State v. McCrary*, 2d Dist. Montgomery No. 18885, 2002 WL 125760, *2-3 (Feb. 1, 2002). This test or list of factors has not previously been applied by this court or recognized as the method for evaluating whether *Miranda* warnings are required. This writer's concern is that it is entirely unclear how much weight to give any of the factors or why review should be constrained to these factors. Applying such a test places too much emphasis on these factors to the exclusion of other relevant considerations which may not be on the majority's list. While the majority contends that the list of factors is "not an exhaustive and exclusive metric," such a list, by its very nature, encourages officers and reviewing courts to give more weight to these factors in particular.

{¶102} The *McCrary* court recognized that it "do[es] not mean to suggest the analysis is a simple counting exercise," but then proceeded to conclude that a custodial interrogation did not occur when six of the ten factors weighed in the State's favor. *Id.* at *3. As outlined above, a general examination of the totality of the circumstances when viewed through the eyes of a reasonable person gives the courts appropriate leeway to take into account any potential factors that may be relevant. The majority's opinion alludes to the existence of some of the factors in the ten-step test, but does not address each factor, leaving law enforcement guessing as to when a *Miranda* warning is actually required. This court should not adopt an artificial test as a manner of determining custodial interrogation issues. By doing so the majority unnecessarily burdens an officer

with considering as many as ten factors in order to determine if a *Miranda* warning is required. Such a burden is both unreasonable and impractical and may lead to the exclusion of otherwise proper evidence. Expecting officers to run the gauntlet of the majority's ten factors is to set up law enforcement for failure as certain as the Kobayashi Maru test.

{¶103} Nonetheless, even when considering the *McCrary* factors as part of an overall evaluation of this case, there are no grounds to find a custodial interrogation occurred. Although this court should not adopt a specific set of factors even the analysis suggested by the majority reinforces the conclusion above that this was not a custodial interrogation since a majority of the factors weigh against a finding that Benson was in custody.

{¶104} As to the first *McCrary* factor, the location of the questioning, it is quite clear this is favorable to finding a noncustodial interrogation for the reasons discussed at length above. Simply put, Benson was in a public area, clearly in the open and near businesses and homes, preventing police abuse.

{¶105} The second factor, whether a defendant is a suspect at the time the questioning began, also does not weigh in Benson's favor. The majority emphasizes that Benson was a suspect from the beginning of the stop, rendering the questions "investigative" and designed to elicit incriminating statements. Here, the questioning began while Benson was merely the passenger in a traffic stop. While the questioning did continue when officers began to suspect Benson of a crime, it is noteworthy that *McCrary*'s statement of this factor specifies that *Miranda* warnings are not required simply because "the investigation has focused." Regardless, even if Benson was immediately a

32

suspect, it does not follow that *Miranda* warnings were required. If an officer suspects someone has committed a crime and detains that person to investigate the circumstances provoking suspicion, he "is not required to give the person *Miranda* warnings before asking questions, because of the 'comparatively nonthreatening character of detentions of this sort.'" *State v. Campbell*, 2d Dist. Montgomery No. 26497, 2015-Ohio-3381, ¶ 10, citing *Berkemer*, 468 U.S. at 440, 104 S.Ct. 3138, 82 L.Ed.2d 317.

{¶106} The third factor relates to whether Benson's freedom to leave was restricted. While there were officers surrounding Benson, it must also be emphasized that the majority's contention that she lacked a "choice" about whether to answer police questions is not supported by the facts. The body cam video indicates that Benson was freely cooperating with the officers and was standing comfortably by the truck during the entirety of the questioning.

{¶107} The fourth factor asks the court to consider whether a defendant was handcuffed or under arrest. During the questioning, Benson was not handcuffed and officers mentioned her going to jail only after much of the questioning was complete and she had admitted to having "speed." Only toward the end of the conversation did the officers discuss charging her with possession, which carries little weight when analyzing whether she was in custody at the time she made the incriminating statements. The fourth factor does not support a finding of custodial interrogation.

{¶108} The fifth factor is also unfavorable to Benson, as it inquires whether there were threats made during the interrogation. It is evident that officers made no threats to Benson but merely questioned her about her drug possession and the details surrounding how she acquired the drugs. Further, their tone and demeanor, while authoritative, was

33

not overly aggressive or otherwise verbally intimidating.

{¶109} Next, the sixth factor relates to whether the defendant was physically intimidated during the interrogation, which the evidence demonstrates was not the case. During the questioning the officers were not standing in Benson's personal space or, from what can be seen in the video, physically intimidating her in any manner. As noted above, Benson was permitted to comfortably stand by the truck and was not taken aside, moved, or otherwise touched by the officers.

{¶110} The seventh factor relates to whether the officers "verbally dominated the interrogation." While the majority answers this in the affirmative, such a conclusion is contrary to the evidence presented. The majority points to the emotional state of Benson, noting that she appeared nervous and "choke[d] back tears," further stating that when she was questioned by multiple officers she threw her hands up, stating "I can't even … I can't have both of you…" Benson herself also points to her personal characteristics in addressing the impact of the questioning, noting that she is "petite" in comparison to the officers. Emphasis on Benson's feelings or interpretation of the questioning is misplaced. A "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). Whether a person is more sensitive or more easily unsettled than another individual is not the pertinent inquiry. Again, this court must consider whether a "reasonable person" would have understood himself to be in custody. *Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, at ¶ 1. A standard that is grounded in the suspect's sensitivity ignores the reality that any person who has committed a crime is

34

likely to be more upset when questioned by the police. By that measure the majority effectively sets up two standards: one for the innocent, who are presumably less sensitive to police questioning, and a separate, stricter standard for the guilty who are predictably upset at any inquiry by an officer.

{¶111} Further, it is improper to characterize officers asking a variety of questions as "verbal domination" since making such inquiries would not be uncommon in any interaction between police and the general public, especially in a traffic stop. Benson was fully permitted time to answer the questions and engaged in a dialogue with the officers. In fact, the video in this case actually supports the view that Benson was not intimidated or dominated by the questioning officers. When Benson protested to taking questions from the two officers simultaneously, the officers acquiesced and complied with her request, indicating that Benson, not the officers, was controlling the dialogue.

{¶112} The eighth *McCrary* factor asks what the defendant's purpose was for being at the location where questioning took place. Benson was in the location of the questioning as a result of a traffic stop and suspicion of drug activity, rather than taken into a police cruiser or the police station. There is nothing about the location that would weigh in favor of Benson being in police custody.

{¶113} The ninth factor questions whether any neutral parties were present. Here, there were several officers and the only other party that was present during the stop was the driver. It is difficult to determine, however, what role the driver played since, while he was present during the initial stop, he is not shown in the videotaped footage of the questioning.

{¶114} The final factor to consider in completing a thorough analysis in this matter

is whether the police took action to trick or coerce Benson into making a statement or confessing. Although the majority again emphasizes Benson's "emotional reaction," this does not demonstrate coercion. *State v. Powe*, 9th Dist. Summit No. 21026, 2002-Ohio-6034, ¶ 10. Furthermore, if the measure of the coerciveness of police questions was whether a defendant became upset during questioning, such a tactic could be adopted by anyone interacting with police.

{¶115} Additionally, officers' requests for Benson to "be honest" on multiple occasions do not amount to coercion. That a police officer would request a person suspected of a crime to make honest statements is hardly unusual or manipulative. "Admonitions to tell the truth" have been held to be "permissible" and are not coercive or "police overreaching." *State v. Cooey*, 46 Ohio St.3d 20, 28-29, 544 N.E.2d 895 (1989); *State v. Jett*, 11th Dist. Portage No. 97-P-0023, 1998 WL 258166, *4 (Mar. 31, 1998). Thus, simply put, there is no evidence of coercion that would allow for the application of the tenth factor in favor of Benson.

{¶116} Although the majority offers no guidance on how much weight to give each factor or how many must be met, an analysis of all of the evidence present in this case, regardless of the applicability of any specific test or list of factors, strongly weighs in favor of finding no custodial interrogation occurred. Even when utilizing the *McCrary* factors, the evidence does not support the conclusion reached by the majority and weighs heavily against suppression.

{¶117} It is important to recognize any questioning by a police officer is by its very nature dynamic and precarious. Police officers by necessity simultaneously seek to elicit information from a person being questioned while maintaining awareness/vigilance of all

the surrounding circumstances including any danger which may develop from that person, other parties in the area, and even the risks from road traffic.

{¶118} Judges have the privilege to consider these issues in the calm and protected environment of our chambers, while a police officer must often act under extreme circumstances or danger. The majority should not impose upon law enforcement additional burdens likely to result in the exclusion of reliable evidence. Such a ruling is both unwarranted and unwise.

{¶119} Finally, while the majority holds that it is necessary for the lower court on remand to make a determination as to whether the drugs were properly seized, Benson's argument regarding suppression hinges upon this court's determination as to whether the police questioning violated *Miranda*. Since the questioning of Benson was valid at all points, she freely admitted to having drugs in her purse, and police conducted the search after this admission, there can be no legitimate dispute that police had probable cause to search for and seize the drugs.

{¶120} For the foregoing reasons, since Benson was not in custody and *Miranda* warnings were not required, the trial court properly denied her motion to suppress. Thus, I must respectfully dissent.